UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DONALD SIMONS,
      Plaintiff,


      v.                                    CIVIL ACTION NO.
                                            13-11668-MBB


CAROLYN W. COLVIN, Acting Commissioner
of the Social Security Administration,
      Defendant.

**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION**
**OF THE COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION**
**(DOCKET ENTRY # 16); DEFENDANT'S MOTION TO AFFIRM THE**
**COMMISSIONER'S DECISION (DOCKET ENTRY # 23)**

**July 15, 2015**


**BOWLER, U.S.M.J.**

Pending before this court are cross motions by the parties,

plaintiff Donald Simons ("plaintiff") and defendant Carolyn W.

Colvin ("Commissioner"), Acting Commissioner of Social Security

Administration.  Plaintiff seeks to reverse the decision of the

Commissioner under 42 U.S.C. § 405(g).  (Docket Entry # 16).

The Commissioner moves for an order to affirm the decision.

(Docket Entry # 23).  After conducting a hearing on May 15,

2015, this court took the motions (Docket Entry ## 16, 23) under

advisement.

PROCEDURAL HISTORY

On December 13, 2010, plaintiff filed an application for social security disability income ("SSDI") as well as an application for supplemental security income ("SSI") with the Social Security Administration ("SSA").  (Tr. 133-141).  The application alleged a disability onset date of April 1, 2005. (Tr. 135).  The SSA denied the claims on March 31, 2011, and the claims were again denied upon reconsideration on July 26, 2011. (Tr. 76-81, 93-98).  Following the denials, plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 99-100).  The ALJ conducted a hearing on May 22, 2012, at which both plaintiff and a vocational expert ("VE") testified.  (Tr. 37-71).  On May 25, 2012, the ALJ issued a decision finding plaintiff was not disabled.  (Tr. 14-31).  The ALJ concluded that, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (Tr. 30).

The Appeals Council denied plaintiff's request of review thereby affirming the ALJ's decision as the final decision. (Tr. 7-9, 1-6).  On July 10, 2013, plaintiff filed this action against the Commissioner pursuant to 42 U.S.C § 405(g).

Plaintiff submits the ALJ's findings are "not supported by substantial evidence."  (Docket Entry # 17).  Specifically,

plaintiff argues the ALJ failed to properly consider plaintiff's "diagnoses of cirrhosis of the liver and obstructive sleep apnea" in determining plaintiff's residual functional capacity ("RFC"). (Docket Entry # 17). The Commissioner seeks to affirm the ALJ's decision and submits substantial evidence supports it. (Docket Entry # 24).

FACTUAL BACKGROUND

I.  <u>Plaintiff's Background and Work History</u>

Born July 9, 1963, plaintiff was 48 years old at the time of the ALJ hearing. (Tr. 42-43). He was unmarried and living with an elderly friend in subsidized housing for the elderly and disabled. (Tr. 43, 45). Plaintiff provided "companionship, safety, bill-paying and some light shopping and cooking" for his roommate. (Tr. 131). Plaintiff completed the twelfth grade and two years of college. (Tr. 521, 200). He does not drive and takes public transportation through the Massachusetts Bay Transportation Authority's "The Ride" program. (Tr. 44).

Plaintiff worked as an art gallery manager, sandwich maker, restaurant host, magazine sales representative, political fundraiser and telemarketer. (Tr. 206). Plaintiff claimed he was unable to work since April 1, 2005, but worked for one month in 2009. (Tr. 135-136). He reported he last worked in September 2010. (Tr. 199-200). Medical notes from March 1, 2010, and October 2011 through April 2012 indicated that

3

plaintiff was working full-time without restriction, but no
occupation was listed.  (Tr. 298, 734, 735, 738, 739, 742,).
Medical notes from April 2012 listed his occupation as sales.
(Tr. 747, 786).  He reported earnings of $27.50 in 2007,
$2,190.25 in 2009 and $366.50 in 2010.  (Tr. 154).  At the ALJ
hearing, plaintiff testified that he helped his elderly roommate
with taking medicines, filling out paperwork, managing finances
and some cooking.  (Tr. 45).

II.  Plaintiff's Medical History

Plaintiff has a documented history of joint pain
specifically in the low back, neck, hip, knee, ankle and feet.
(Tr. 325, 338, 371, 497, 498).  The ALJ summarized that,
"Treating physicians opined the cause of his pain was a
combination of degenerative disc and joint disease, gouty
arthritis and hip dysplasia, which were exacerbated by his
deconditioned body habitus and obesity."  (Tr. 22).
The record reflects a history of poorly controlled
hyperlipidemia and recent onset of fatty liver leading to liver
cirrhosis.  (Tr. 310, 317, 355, 572).  Plaintiff was also
treated for ongoing but stable depression and anxiety issues.
(Tr. 132, 309).

On November 21, 2005, plaintiff was seen at the medical
walk in unit of Massachusetts General Hospital ("MGH") for a
recent episode of gout in his right knee.  (Tr. 398).  At the

time of the visit, plaintiff had not had a physical exam for approximately ten years prior. (Tr. 398). On December 13, 2005, plaintiff returned to MGH reporting continued knee pain and swelling. (Tr. 395). At that time, Pasha Sarraf, M.D., Ph.D. ("Dr. Sarraf") aspirated synovial fluid from plaintiff's right knee and injected the same joint with Depo-Medrol and lidocaine. (Tr. 394).

On a December 21, 2005 visit to MGH, plaintiff reported "chronic low back pain." (Tr. 390). According to clinic notes from Barham K. Abu Dayyeh, M.D. ("Dr. Dayyeh"), plaintiff smoked one pack of cigarettes a day for at least the past 20 years and was "interested in quitting." (Tr. 390-391). He reported some symptoms of irritable bowel syndrome. (Tr. 391). He was currently unemployed, but "looking for a job" and was "living with a friend" on Cape Cod. (Tr. 391).

On May 8, 2006, plaintiff saw Seyed Ali Mostoufi, M.D. ("Dr. Mostoufi") at MGH for back pain, right leg discomfort and anxiety. (Tr. 388). Upon examination, plaintiff was "inflexible in his lumbosacral spine," but "pretty flexible and normal in the cervical spine" with ranges of motion in his upper and lower extremities normal. (Tr. 388). Sensation was "intact in both upper and lower" extremities. (Tr. 388). Deep tendon reflexes were sluggish at L3. (Tr. 388). A straight leg raise test "did not cause any leg pain but" did cause "some axial low

back pain." (Tr. 388).  Dr. Mostoufi noted an "abnormal click
in the right hip" that was "quite audible." (Tr. 388).
Plaintiff's knees showed no sign of swelling or instability but
displayed mild tenderness more on the right knee than the left.
(Tr. 388).

On January 9, 2006, plaintiff underwent a magnetic
resonance imaging test ("MRI") of the lumbosacral spine at MGH.
(Tr. 388, 423).  On May 8, 2006, Dr. Mostoufi reported that the
MRI revealed disc extrusions in the L3/L4 and L4/L5 possibly
touching the descending right side L4/L5 nerve roots.  (Tr.
388).  Dr. Mostoufi reported "moderate[ly] severe left and mild
right neuroforaminal narrowing as a result of dis[c] protrusion"
at the L5/S1 level.  (Tr. 388).  Dr. Mostoufi viewed x-rays of
the left hip and noted "decreasing convexity of the left femoral
head and neck junction representing the femoral acetabular
impingement." (Tr. 388).  Dr. Mostoufi also viewed lumbosacral
spine x-rays that revealed "mild dis[c] facet degenerative
changes at L4/L5 and L5/S1" with no evidence of fracture.  (Tr.
388).  He noted plaintiff had "a radicular pattern of pain as a
result of dis[c] protrusion and neuroforaminal narrowing" and
noted that plaintiff was "deconditioned and out of shape as
well." (Tr. 389).

On May 10, 2006, during a follow up visit with Dr. Dayyeh
at MGH, plaintiff reported he was currently working on Cape Cod

6

and was interested in quitting smoking.  (Tr. 385).  Plaintiff also reported that a steroid injection for his low back pain had produced "good results."  (Tr. 384).  The following month, on June 12, 2006, plaintiff reported to Dr. Mostoufi that the L4 epidural injection produced no improvement.  (Tr. 383).  At that time, Dr. Mostoufi did not believe the musculoskeletal pain and right knee and left hip degenerative changes were related to plaintiff's spine.  (Tr. 383).

On August 4, 2006, during a follow up visit with Dr. Dayyeh at MGH, plaintiff reported continued low back, left hip and right knee pain.  (Tr. 379).  Dr. Dayyeh reported plaintiff had been referred to the lumbar stabilization program and ortho sport clinic, but had not yet been seen by either.  (Tr. 379).

On October 13, 2006, plaintiff reported to Dr. Dayyeh that he had not followed up with the ortho sport clinic or physical therapy because "he was out of town."  (Tr. 377).  Dr. Dayyeh noted plaintiff had gained ten pounds on his trip.  (Tr. 378).  Plaintiff admitted, "[H]e did a lot of things wrong and would want a period to get adjusted before working on any of his issue[s]."  (Tr. 378).

On March 23, 2007, Rachel Grisham, M.D. ("Dr. Grisham") examined plaintiff's inflamed left wrist which began to hurt after a "particularly aggressive joint popping session" four weeks prior.  (Tr. 375).  On March 26, 2007, rheumatologist

Angel Tsai, M.D. ("Dr. Tsai") diagnosed plaintiff with left hand tenosynovitis. (Tr. 373). An x-ray of the left wrist found "no displaced fractures or dislocations" and "mild degenerative changes." (Tr. 374).

On April 18, 2007, during a follow up visit for the left wrist pain, Dr. Dayyeh noted that the swelling of the left wrist had improved, but plaintiff had tenderness of the wrist joint with intact sensation. (Tr. 368). Dr. Dayyeh reported plaintiff had a "peri-anal fistula" and placed a surgery referral. (Tr. 367). Dr. Dayyeh also noted plaintiff was currently working on Cape Cod. (Tr. 368).

On May 9, 2007, plaintiff met with Daniel Guss, M.D. ("Dr. Guss"), a surgical intern at Churchill Blue Surgical Clinic. (Tr. 365). Dr. Guss noted "[n]o visible perianal abscess" and plaintiff reported greatly improved symptoms subsequent to "taking warm baths." (Tr. 365). The next day, plaintiff met with Dr. Dayyeh who noted plaintiff's wrist swelling was "much improved" but he was still having "some pain." (Tr. 363). Dr. Dayyeh also noted the "[p]eri-anal abscess [was] resolved." (Tr. 364).

On September 5, 2007, plaintiff again met with rheumatologist Dr. Tsai at MGH. (Tr. 359-362). During the visit, plaintiff stated his left wrist was "now back to normal since June 2007." (Tr. 359). Plaintiff reported intermittent

8

knee and ankle pain that felt "like 'gout starting,'" but those
episodes would resolve if he stretched or took ibuprofen.  (Tr.
359).  Plaintiff reported feeling well "with no joint
complaints."  (Tr. 359).

On November 19, 2007, plaintiff met with Dr. Dayyeh and
described chest pain and right lower extremity pain.  (Tr. 355-
356).  Plaintiff reported intermittent left side chest pain
sometimes radiating to his left arm, associated with some
nausea, lasting for a "few seconds to minutes" over the past
three months.  (Tr. 355).  Plaintiff also reported severe right
calf pain that started three days before the visit after walking
for two hours.  (Tr. 355).  He also reported chronic left hip
pain that was "progressively getting worse."  (Tr. 355).  Dr.
Dayyeh noted plaintiff's hyperlipidemia was "poorly controlled"
and "non-complian[t] with medication."  (Tr. 355).  Dr. Dayyeh
referred plaintiff to the emergency department at MGH ("ED") for
evaluation of plaintiff's chest pain.  (Tr. 352-354).  The ED
tested plaintiff for myocardial infarction by cardiac enzymes
and the test results were negative.  (Tr. 353).  The ED's
testing of the right femoral and popliteal veins by ultrasound
and pulsed wave Doppler was normal and showed "no evidence of .
. . deep venous thrombosis."  (Tr. 353)(capitalization omitted).
Urine screening performed at ED was positive for cocaine.  (Tr.
353).

On December 12, 2007, plaintiff met with Stephanie Rose, M.D. ("Dr. Rose") at MGH's medical walk in unit. (Tr. 350-351). Plaintiff reported stiffness in the left knee and pain that had kept him awake the previous night. (Tr. 350). Dr. Tsai aspirated the left knee and noted "two rare crystals" in the synovial fluid, but stated he would "not call it crystal disease at this point." (Tr. 349). The following day, on December 13, 2007, Dr. Tsai reported left knee x-rays were normal with some pain when palpitating the patellar area and reduced range of motion due to pain. (Tr. 346-347). The following week, on December 17, 2007, Dr. Tsai decided to "hold off on steroid injection for now" and advised a longer acting NSAID, weight loss and a knee brace. (Tr. 344).

On February 1, 2008, plaintiff met with Douglas Peterson, M.D. ("Dr. Peterson") at MGH for an evaluation of his left knee pain. (Tr. 331). Plaintiff reported that knee pain became "worse with prolonged walking and especially going up and down stairs and keeping the knee bent for prolonged periods." (Tr. 331). Upon examination, Dr. Peterson reported plaintiff's knee revealed no effusion, pain over the patella with full flexion, but a good range of motion and tenderness with palpitation. (Tr. 331). Dr. Peterson recommended physical therapy with possible cortisone injections if plaintiff failed to improve over the following six to eight weeks. (Tr. 331).

On March 19, 2008, plaintiff had a follow up visit with Dr. Dayyeh. (Tr. 329-330). Plaintiff reported regularly taking medication to control his hyperlipidemia and an interest in quitting smoking. (Tr. 329). Dr. Dayyeh reported plaintiff's "mood is stable with no current signs or symptoms of depression/mania/psychosis/denied substance abuse." (Tr. 329). Plaintiff was not interested in referral to a weight clinic though Dr. Dayyeh reviewed with him the "importance of weight los[s] and good eating habits." (Tr. 329). The next month, on April 8, 2008, Dr. Dayyeh reported plaintiff had gained ten pounds, but remained uninterested "in nutrition or obesity clinic consult." (Tr. 327-328). Dr. Dayyeh reported plaintiff was taking medication for smoking cessation, but still smoking one pack per day. (Tr. 327).

On May 5, 2008, plaintiff met with orthopedist Joseph McCarthy, M.D. ("Dr. McCarthy") at MGH for evaluation of left hip pain. (Tr. 325-326). Dr. McCarthy diagnosed hip dysplasia and degenerative disc disease following evaluation of plaintiff's x-rays and examination. (Tr. 325). Dr. McCarthy recommended a cortisone injection and weight loss to help with hip and joint pain. (Tr. 325). Later that week, on May 7, 2008, Dr. Dayyeh noted plaintiff had gained weight since the last visit but remained uninterested in nutrition or obesity clinic consult. (Tr. 323). Later that month, on May 22, 2008,

plaintiff met with James Sarni, M.D. ("Dr. Sarni") who noted plaintiff's complaints are "actually quite vague." (Tr. 322). On examination, Dr. Sarni noted an uneven pelvis that levels out with a one half-inch lift under the left heel. (Tr. 322). Dr. Sarni stated, "Functionally I believe this patient is doing relatively well." (Tr. 322). Dr. Sarni provided plaintiff with a prescription for the heel lift and suggested some physical therapy but believed there was little else warranted at that time. (Tr. 322).

On October 8, 2008, plaintiff reported right foot and ankle pain and swelling to Eric Ackah, M.D., Ph.D ("Dr. Ackah"). (Tr. 320-321). Dr. Ackah reported the "foot pain was most likely from plantar fasciitis with resultant tendinitis" and "less likely to be gout or rheumatoid arthritis." (Tr. 321). Later that month, on October 29, 2008, met with a new primary care physician ("PCP"), Mark Awad, M.D., Ph.D. ("Dr. Awad"). (Tr. 317-319). Dr. Awad reported plaintiff had stopped taking medication for hyperlipidemia after his prescription lapsed one month prior. (Tr. 317). Plaintiff reported he was not going to physical therapy because his symptoms would "usually subside by the time [of the] appointment." (Tr. 317). He also reported right knee, ankle, and left hip pain that was greatly helped with ibuprofen and Vicodin. (Tr. 317). Dr. Awad advised plaintiff that diet and exercise may improve "his lower

extremity join pains" and plaintiff was "[w]illing to talk to weight management services." (Tr. 317). Plaintiff again expressed an interest in smoking cessation counseling. (Tr. 317-318). He was also currently smoking marijuana on a weekly or bi-weekly basis. (Tr. 318). He reported "low moods" made worse by leg pain and believed he could not hold a job if he had to "stand on his legs for prolonged periods." (Tr. 318). He also reported living with the elderly gentleman and helping with his basic needs. (Tr. 318). Plaintiff reported not working regularly, but doing "odd jobs over the past few years." (Tr. 318).

On December 17, 2008, plaintiff met with Ning Tang, M.D. ("Dr. Tang") for recurrence of left foot pain. (Tr. 315-316). Plaintiff reported left foot pain, swelling, and stiffness occurring over the prior week. (Tr. 315). Dr. Tang prescribed medication and treatment for gout given the repetitive nature of the condition and presenting signs and symptoms. (Tr. 316).

On January 14, 2009, plaintiff had an initial nutrition visit with dietician Alexa Schmitt, R.D. ("Schmitt"). (Tr. 313-314). Schmitt reported plaintiff was 72 inches, 284.5 pounds with a body mass index ("BMI") of 38.5. (Tr. 313). Schmitt provided plaintiff with educational material and discussed meal plans and eating strategies. (Tr. 314).

On February 25, 2009, plaintiff met with his PCP, Dr. Awad. (Tr. 310-312).  Dr. Awad noted plaintiff's weight was stable and plaintiff was not interested in going back to the nutritionist preferring to focus on using "common sense" measures to control his diet and weight.  (Tr. 310).  Plaintiff stopped taking medication for hyperlipidemia a month prior to this visit and Dr. Awad recommended taking the medication regularly.  (Tr. 310).  Plaintiff complained "of pain in his neck, back, shoulders, wrists, hips and knees."  (Tr. 310).  Plaintiff requested an MRI for his neck, shoulders and hips, but after physical examination, Dr. Awad believed an MRI evaluation was not needed.  (Tr. 310).  Dr. Awad offered referrals to physical therapy and the pain clinic, but plaintiff was uninterested. (Tr. 310).  Plaintiff was also not interested in taking the suggested ibuprofen as he did not think it was effective.  (Tr. 310).

On March 31, 2009, plaintiff met with Lisa Mortimer ("Mortimer"), a licensed social worker at MGH.  (Tr. 308-309). Plaintiff reported he had "trouble completing things" and needed "financial help" and probably "some counseling."  (Tr. 308). Mortimer diagnosed plaintiff with an adjustment disorder with mixed anxiety and depressed mood and assigned a GAF score[1] of 60.

---

[1]  GAF stands for Global Assessment of Functioning.  A GAF score between 51 and 60 indicates moderate symptoms or moderate

(Tr. 309).  Mortimer noted plaintiff "has good insight about himself as well as a sense of humor."  (Tr. 308).

On October 6, 2009, plaintiff first met with Robert Kelleher, M.D. ("Dr. Kelleher") at Mount Auburn Hospital ("Mount Auburn").  (Tr. 480-481).  Plaintiff's primary complaint was left knee pain for which Dr. Kelleher proscribed Percocet.  (Tr. 480).  Plaintiff reported he was currently working.  (Tr. 480). During a routine medical examination on October 28, 2009, Dr. Kelleher noted plaintiff's left knee had "mild swelling and tenderness upon flexion."  (Tr. 477).

On November 9, 2009, plaintiff met with Dr. Kelleher and reported "anxiety issues" and "some subsequent insomnia."  (Tr. 476).  Dr. Kelleher then proscribed Ambien.  (Tr. 476).  Later that month, on November 20, 2009, Dr. Kelleher noted plaintiff had "severely elevated cholesterol."  (Tr. 475).

Plaintiff met with sports orthopedic doctor Leo Troy, M.D. ("Dr. Troy") on November 25, 2009, for worsening neck, low back and left knee pain.  (Tr. 512-517).  Plaintiff stated his knee pain "interferes with his ability to do his job caring for an older gentleman."  (Tr. 512).  X-rays of the cervical spine were normal.  (Tr. 513).  Upon examination of the spine and knee, Dr. Troy noted "generalized tenderness" and a "minimal decrease in

difficulty in social, occupational or school functioning.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2002).

all ranges of motion." (Tr. 513-514). Dr. Troy discussed with plaintiff "management with anti-inflammatory medication, icing and physical therapy exercise." (Tr. 514). On December 11, 2009, Dr. Troy reviewed plaintiff's lumbar spine MRI results. (Tr. 500-501). Dr. Troy's impression was "[l]umbar spondylosis" with the worst at the L5/S1 level and "[s]mall posterior disc protrusions" at the L3/L4 and L4/L5 levels. (Tr. 501).

On January 4, 2010, plaintiff saw Dr. Kelleher for a follow up cholesterol check. (Tr. 472-473). Plaintiff had elevated triglycerides and below normal high density lipoproteins cholesterol. (Tr. 472). The hepatic panel showed normal results. (Tr. 473). Dr. Kelleher noted plaintiff continued to have "occasional spasms in his left leg." (Tr. 472).

During a follow up visit with Dr. Kelleher on February 18, 2010, plaintiff's triglyceride levels were elevated. (Tr. 471). Dr. Kelleher recommended plaintiff lose 20 pounds "over the next 6 months to . . . alleviate some of his symptoms of back pain." (Tr. 470). The hepatic panel again showed normal results. (Tr. 471). On March 4, 2010, during another follow up visit, Dr. Kelleher noted plaintiff continued to have "severely elevated triglycerides" despite taking appropriate medication. (Tr. 468). Dr. Kelleher reviewed the dangers of smoking with plaintiff and recommended that he quit as soon as possible. (Tr. 468-469).

On March 1, 2010, plaintiff saw German Levin, M.D. ("Dr. Levin") at the Cambridge Spine Center for assessment of lower back and neck pain.  (Tr. 298-300).  Plaintiff reported the "pain significantly interferes with [his] sleep as well as activities of daily living."  (Tr. 298).  Dr. Levin did not recommend any injections and advised plaintiff to "continue taking ibuprofen . . . and Percocet sparingly for pain control." (Tr. 299).  An MRI taken at Mount Auburn Hospital on March 10, 2010, revealed "[m]inor degenerative dis[c] disease resulting in mild encroachment of the right C3/C4" and "borderline narrowing of the C4/C5 neural foramen."  (Tr. 301).  There was no "spinal canal stenosis at any level[]" or "signal abnormality of the cervical cord."  (Tr. 301, 507).

Plaintiff met with Dr. Kelleher on April 21, 2010, to discuss ongoing left knee pain.  (Tr. 464-465).  Dr. Kelleher noted plaintiff would follow up with an "orthopedic doctor for further evaluation."  (Tr. 464).  The following month on May 20, 2010, plaintiff met with Dr. Kelleher to follow up with cholesterol levels.  (Tr. 462-463).  Dr. Kelleher increased plaintiff's Zocor dosage to combat elevated triglyceride levels. (Tr. 462-463).  Dr. Kelleher noted plaintiff had seen a number of orthopedic doctors who all recommended weight loss and physical therapy.  (Tr. 462).  An April 22, 2010 MRI of

plaintiff's left hip indicated findings "suspicious" for a
degenerative tear and gluteus medius tendonitis.  (Tr. 495).

Plaintiff met with Dr. Kelleher during a follow up visit on
July 1, 2010, to discuss chronic pain issues.  (Tr. 460-461).
Plaintiff had developed some "right-sided foot pain which waxes
and wanes from time to time . . .."  (Tr. 460).  Dr. Kelleher
recommended weight loss for plaintiff's chronic pain.  (Tr.
460).  Later that month on July 22, 2010, during a follow up
visit with Dr. Kelleher, plaintiff reported anxiety related to
his mother recently passing away and some issues getting money
from a trust.  (Tr. 458).  Dr. Kelleher proscribed Lunesta for
plaintiff's anxiety related insomnia.  (Tr. 458).  An MRI on
August 6, 2010, revealed "no significant change" in the lumbar
spine since the MRI on December 11, 2009.  (Tr. 494).

On September 21, 2010, plaintiff complained of recent left
wrist pain.  (Tr. 454).  On October 1, 2010, plaintiff met with
Dr. Kelleher for follow up of recent swelling of the left wrist.
(Tr. 452-453).  All symptoms were resolved but Dr. Kelleher
recommended plaintiff visit a rheumatologist.  (Tr. 452).  Later
that month on October 12, 2010, plaintiff's left wrist was
"markedly swollen with tenderness."  (Tr. 450).  Dr. Kelleher
noted plaintiff was following up with Dr. Levin at the Cambridge
Spine Center after being diagnosed with "multilevel degenerative
changes in the lumbar spine as well as multilevel degenerative

disc disease in the lumbar area, L4-L5." (Tr. 450). Dr. Kelleher also recommended a mental health provider for plaintiff's ongoing anxiety issues. (Tr. 450). On October 26, 2010, plaintiff's triglycerides were again well above normal. (Tr. 449). Dr. Kelleher noted plaintiff's "pain symptoms seem[ed] to be much better." (Tr. 448).

On October 19, 2010, plaintiff met with Dennis William Burke, M.D. ("Dr. Burke") at MGH for evaluation of bilateral hip pain. (Tr. 306). Upon examination, plaintiff weighed 270 pounds, walked with a "non-antalgic limp" and both hips were supple. (Tr. 306). X-rays showed "excellent joint space" and "mild degenerative changes." (Tr. 306). Dr. Burke opined that plaintiff was not a candidate for hip replacement. (Tr. 306).

On November 2, 2010, Dr. Kelleher placed plaintiff on a steroid taper in order to resolve "lingering wrist issues and some foot pain issues." (Tr. 446). Plaintiff's hepatic panel was normal. (Tr. 447).

During a follow up visit on December 6, 2010, plaintiff was "interested in doing some physical therapy to strength[en] . . . his upper extremities and wrists." (Tr. 444-445). On January 7, 2011, plaintiff reported to Dr. Kelleher that he would like to "work [on] his weight [and] stop smoking." (Tr. 442). Plaintiff reported intermittent joint pain especially in his left wrist. (Tr. 442). Follow up labs on January 14, 2011,

showed an elevation of plaintiff's cholesterol.  (Tr. 440).  On February 14, 2011, during a follow up visit, Dr. Kelleher reported plaintiff "continue[d] to have improvement in his overall joint pain issues" and "recently restarted physical therapy for his neck issues."  (Tr. 438).

On December 13, 2010, plaintiff told Dr. Levin that his lower back "pain [was] continuous but significantly worse[ned] with activities such as standing or sitting for extended period[s] of time, lifting, bending and twisting."  (Tr. 503). Dr. Levin opined that it would be "very difficult" for plaintiff to find employment which involves those activities and almost all "activities also potentially may aggravate patient's symptoms." (Tr. 503).  Dr. Levin further opined plaintiff "might tolerate light duty activities such as a desk job on a part-time basis at around 4 or 5 hours a day for 16 [to] 20 hours a week." (Tr. 503).

On February 10, 2011, a non-examining DDS medical consultant, Eugene Meyer, M.D. ("Dr. Meyer"), completed a RFC of plaintiff's physical condition.  (Tr. 428-436)  Dr. Meyer noted lower back pain as the primary diagnosis with neck pain and morbid obesity as the secondary diagnosis. (Tr. 429) Dr. Meyer opined plaintiff could occasionally lift 20 pounds, frequently lift ten pounds with other limitations regarding the ability to stand for at least two hours and sit for about six hour within

an eight hour work day.  (Tr. 430).  Dr. Meyer noted a

"[m]edical source suggested part time work," but his assessment

was based on an eight hour work day.  (Tr. 435).  Dr. Meyer was

likely referring to the above note from Dr. Levin.  (Tr. 503).

On February 15, 2011, Dr. Meyer completed a case analysis

and medical evaluation of the medical record.  (Tr. 518-519).

Dr. Meyer reported plaintiff alleged osteoarthritis, arthritis

and hip dysplasia.  (Tr. 519).  He noted from the face to face

interview that plaintiff had "difficulty sitting, walking and

standing."  (Tr. 519).  He also noted the medical sources were

varied but all were consistent with plaintiff's symptoms, x-rays

and examinations.  (Tr. 519).

X-rays on February 24, 2011, compared to October 19, 2010

x-rays revealed "mild degenerative changes of both hip joints

with mild subchondral sclerosis and bony proliferative changes."

(Tr. 585).  The x-rays also revealed moderate degenerative

changes in the lower lumbar spine.  (Tr. 585).

On March 9, 2011, plaintiff met with Mark Dickinson, M.D.

("Dr. Dickinson") at MGH for complaints of constant back pain

and episodic wrist and knee pain.  (Tr. 562-564).

Musculoskeletal findings included left knee crepitus, fluid

around knees, osteoarthritic changes and short fifth digits.

(Tr. 563).  Plaintiff reported muscle aches were better with

narcotics.  (Tr. 562).  He also reported that for exercise he

"walks as [he] can." (Tr. 562).  Dr. Dickinson noted

plaintiff's liver function tests were abnormal.  (Tr. 562).

On March 11, 2011, Lynn Cattanach, Ph.D. ("Dr. Cattanach"),

a Disability Determination Services ("DDS") consultant,

completed a psychological evaluation of plaintiff.  (Tr. 520-

525).  Her mental status examination noted that, "Sleep pattern

was adequate with the use of sleep medications." (Tr. 522).

Plaintiff reported living with the elderly gentleman and

providing him with care.  (Tr. 520).  He said "he spends his

time on a typical day at home and attending medical

appointments." (Tr. 522).  He reported seeing friends and

walking for exercise.  (Tr. 522).  Dr. Cattanach reported,

"[T]he quality of his activities of daily living is independent,

appropriate, effective and sustainable." (Tr. 522).  The

results of an intellectual assessment reveal plaintiff was

"functioning overall in the upper end of the [l]ow [a]verage

range of general cognitive abilities." (Tr. 523).  Dr.

Cattanach reported plaintiff's "ability to understand, carry

out, and remember instructions is somewhat compromised by

variable concentration, distractibility, and impaired short-term

recall." (Tr. 524).  Dr. Cattanbach's diagnosis ruled out

dyslexia and personality disorder.  (Tr. 525).  She also noted

unemployment as a "[p]sychosocial and [e]nvironmental" problem.

(Tr. 525).

On March 22, 2011, Therese Harris, Ph.D. ("Dr. Harris"), a DDS psychologist, reviewed plaintiff's records from April 1, 2005 through March 22, 2011, and filled out a psychiatric review technique form.  (Tr. 527-540).  Per the review form, Dr. Harris noted plaintiff had "no medically determinable impairment" due to "insufficient evidence."  (Tr. 527) (capitalization omitted).

An ultrasound of plaintiff's abdomen on March 22, 2011, at MGH showed fatty liver and splenomegaly and taken together raised "the possibility of diffuse liver disease."  (Tr. 565). There was also "mild common duct dilation" and "possible small gallbladder stones."  (Tr. 565).  X-rays of plaintiff's chest taken the same day showed "[n]o acute cardiopulmonary abnormality" and "no interval change since the prior exam." (Tr. 566).  The next day lab results showed blood sugar levels in the high normal range, elevated triglycerides and recent marijuana use.  (Tr. 567).  Dr. Dickinson continued to recommend weight loss, quitting smoking, and cessation of marijuana use. (Tr. 567).

An MRI of plaintiff's upper abdomen at MGH on April 1, 2011, showed "[s]evere fatty infiltration of [the] liver with cirrhotic morphology."[2]  (Tr. 572).  The MRI showed "[n]o focal lesions."  (Tr. 572).  Dr. Dickinson reported to plaintiff in a

---

[2]  As explained infra, plaintiff's insured status for SSDI benefits expired on March 31, 2011.

letter dated April 4, 2011, that the MRI "showed probable
cirrhosis" and, although the cause was "not clear," he opined it
was "related to fatty liver." (Tr. 573). Dr. Dickinson
recommended weight loss and that plaintiff see a liver
specialist. (Tr. 573).

An MRI of plaintiff's left hip performed at MGH on May 19,
2011, revealed a "prior noted anterior and superior labral tear"
and a "degenerative blunted appearance of the posterior labrum."
(Tr. 586). The MRI also revealed a "decrease in prominence of
partial tear of the distal gluteus medius tendon." (Tr. 586).

Plaintiff received a steroid injection in the left hip on
June 3, 2011, from Brian Bronzo, M.D. ("Dr. Bronzo") at MGH.
Dr. Bronzo noted plaintiff's "[s]ymptoms were decreased
immediately following the procedure." (Tr. 587).

Plaintiff visited MGH licensed social worker Lisa Mortimer
("Mortimer") on June 9, 2011. (Tr. 588). Mortimer noted
plaintiff continued to struggle with "disturbing family
dynamics" and was "surrounded by a number of people with
physical illness and disability." (Tr. 588). Mortimer
concluded plaintiff was stable and coping "reasonably well with
life stress." (Tr. 588).

At the recommendation of Dr. Dickinson, on June 15, 2011,
plaintiff met with Lee F. Peng, M.D., Ph.D. ("Dr. Peng"), a
gastroenterologist, who performed a hepatology consultation.

(Tr. 589-592).  Dr. Peng reported patient had "always been asymptomatic from a liver standpoint."  (Tr. 589).  Plaintiff was receiving the hepatitis A and B vaccination series.  (Tr. 589).  Dr. Peng reported plaintiff's liver morphology and splenomegaly on imaging may have been suggestive of cirrhosis, but a diagnosis of cirrhosis was unclear because there was not other evidence in lab reports or examinations.  (Tr. 591-592).  Accordingly, Dr. Peng ordered a "[l]iver biopsy to assess for cirrhosis."  (Tr. 592).  He further opined that if plaintiff had cirrhosis, he was "well-compensated" evidenced by "good synthetic function."  (Tr. 592).

On the same day, plaintiff had a physical therapy spine orthopedic evaluation with Marie Figueroa ("Figueroa") at MGH.  (Tr. 593-595).  Figueroa's clinical impression after a 60 minute physical therapy ("PT") session noted plaintiff's presentation was consistent with chronic pain, underlying multi-joint degenerative joint disorder and leg length discrepancy limiting plaintiff's baseline level of function.  (Tr. 595).  Figueroa opined that plaintiff would benefit from PT intervention addressing mobility issues and general body mechanics.  (Tr. 595).  Figueroa anticipated a "[g]ood resolution of symptoms and an acceptable functional outcome."  (Tr. 595).

On June 27, 2011, Bill Straub, M.D. ("Dr. Straub"), a non-examining DDS medical consultant, completed a physical RFC.

(Tr. 541-548).  He stated plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand or walk for at least two hours in an eight hour day, sit for about six hours in an eight hour day and had unlimited ability to push or pull including operation of hand or foot controls.  (Tr. 542).  Dr. Straub also posited that plaintiff could occasionally climb a ramp or stairs, balance, stoop, kneel, crouch and crawl and never climb a ladder, rope, or scaffold.  (Tr. 543).  Dr. Straub substantiated this evidence based on plaintiff's conditions of degenerative disc disease, hip dysplasia and osteoarthritis. (Tr. 542).  He stated plaintiff's back pain was evident from MRIs, the "evidence for gout is weak" and "elsewhere the clinical info is spotty."  (Tr. 542).  Dr. Straub also based the aforementioned limits on MRI evidence of a "superior labral tear and cyst with impingement."  (Tr. 542).

Plaintiff saw Alison Brookes, M.D. ("Dr. Brookes") at the MGH medical walk in unit on July 14, 2011, reporting pain, swelling and redness in his toes.  (Tr. 600-601).  Dr. Brookes opined "pseudogout" was a possible explanation for plaintiff's "seronegative arthritis" that has occurred intermittently over the last 20 years and responds to NSAIDs.  (Tr. 601).  She noted plaintiff was reluctant to see a rheumatologist because he felt that the diagnosis of "some sort of gout, despite definitive evidence" was sufficient for him.  (Tr. 601).  She also noted

plaintiff was "clearly not motivated to really take the healthiest approach to diet and cigarettes" in the setting of "intermittently large alcohol intake and 'fatty liver.'" (Tr. 601).

Later that month on July 22, 2011, plaintiff visited Dr. Dickinson to obtain medication for an upcoming bus trip. (Tr. 604-607). Plaintiff reported to Dr. Dickinson that his foot swelling had previously responded to prednisone and nonsteroidal anti-inflammatories, but recurred as soon as he stopped taking medication. (Tr. 604). He also reported having issues with his family and a lawsuit and the person he was caring for had been ill. (Tr. 604). Plaintiff was "tired, but not ill." (Tr. 604). Plaintiff claimed all of his "joints hurt to some degree" and his mood was "fine" but Wellbutrin was not helping. (Tr. 605). Dr. Dickinson described plaintiff's diet as "terrible" and continued to recommend working with PT. (Tr. 606). Dr. Dickinson referred plaintiff to rheumatology citing a history of "recurrent acute inflammatory arthritis" that "looks like gout" but with reports of negative taps. (Tr. 603).

On August 8, 2011, plaintiff met with Dr. Levin and reported continuous moderate to severe low back pain that was significantly worsened with activities. (Tr. 502). Dr. Levin recommended an "L4-L5 interlaminar epidural steroid injection." (Tr. 502).

Plaintiff met with social worker Mortimer at MGH on August 11, 2011.  (Tr. 608).  Plaintiff reported a "very stressful and unproductive trip" to Rochester where he was "involved in legal proceedings around his mother's estate."  (Tr. 608).  Mortimer opined plaintiff was "coping reasonably well with a great deal of life stress."  (Tr. 608).

Plaintiff also met with rheumatologist Flavia Castelino, M.D. ("Dr. Castelino") on August 11, 2011.  (Tr. 609-611).  Dr. Castelino ordered an x-ray of plaintiff's feet that showed a "[m]inimal increase in scattered degenerative changes of both feet."  (Tr. 612).  Plaintiff followed up with Dr. Dickinson a week later on August 18, 2011, regarding his toe issues.  (Tr. 613-616).  Plaintiff reported hurting "all over," but no illness or fever.  (Tr. 613).  Dr. Dickinson noted plaintiff was still depressed and should visit psychiatry, but was stable.  (Tr. 616).

On September 7, 2011, plaintiff met with Mark Gorman, Ph.D. ("Dr. Gorman") at the MGH weight center for a general obesity medicine consultation.  (Tr. 622-632).  Plaintiff's primary diagnosis was night eating syndrome with a history of panic disorder and substance abuse both in remission.  (Tr. 629).  Plaintiff reported feeling "low" and was "tearful when asked in session."  (Tr. 624, 628-629).  Plaintiff also reported plans to

stop smoking, but was "under much stress" and planned to stop next year.  (Tr. 632).

On September 14, 2011, Dr. Dickinson wrote in a letter of disability that plaintiff had "impaired mobility with pain when he walks."  (Tr. 636).  Dr. Dickinson listed osteoarthritis, back pain, hip pain and possible gout as plaintiff's medical problems.  (Tr. 636).  On a routine visit to Dr. Dickinson the same day, plaintiff reported his "whole left side spasmed due to lifting up a bag of laundry" causing plaintiff to remain in bed for a "whole month with pain," but he was slowly recovering. (Tr. 637).  The radiology test showed normal bone density.  (Tr. 654).  Dr. Dickinson noted plaintiff's "liver function tests were normal."  (Tr. 637).  He also noted "cirrhosis on MRI but not by other data."  (Tr. 642).

Plaintiff met with Nadia Ahmad, M.D. ("Dr. Ahmad") for an obesity medical consultation at the MGH weight center on September 16, 2011.  (Tr. 646-650).  Dr. Ahmad noted sleep apnea and snoring as an obesity related problem.  (Tr. 646).  She also noted plaintiff slept only two to six hours per night "due to pain and anxiety" and "does not wake up rested."  (Tr. 646). Plaintiff again visited the MGH weight center later that month on September 28, 2012.  (Tr. 662-663).  Notes from that visit indicate plaintiff missed his mental health appointment and was "working on some stressful family issues."  (Tr. 663).

On September 30, 2011, plaintiff met with Dr. Gorman at the MGH weight center for a psychological evaluation.  (Tr. 665-668).  Dr. Gorman noted plaintiff's mood was "'a little depressed.'"  (Tr. 665).  Dr. Gorman reported plaintiff had a night eating syndrome as a type of eating disturbance.  (Tr. 667).

Plaintiff met with social worker Mortimer on October 6, 2011, for a follow up visit.  (Tr. 669).  She noted plaintiff had a "flare-up of hip pain" that had been affecting his mood.  (Tr. 669).  She also noted plaintiff was "coping reasonably well with life stress, although he continues to use marijuana with some regularity."  (Tr. 669).  His GAF score remained at 55.  (Tr. 669).  On the same day, plaintiff had a PT evaluation for his back and hip at MGH.  (Tr. 670-672).  The clinical impression stated plaintiff's presentation was consistent with a left "hip labral tear as well as likely lumbar disc pathology" that limited "baseline level of function."  (Tr. 671).  Also noted was a fair prognosis for the plaintiff "to return to baseline function providing compliance with the plan of care." (Tr. 671).

On October 14, 2011, plaintiff had a follow up visit with Dr. Dickinson.  (Tr. 675-678).  Upon examination, Dr. Dickinson noted plaintiff walked with a "limp, wide gait, [and] short

steps due to arthritis." (Tr. 677). Plaintiff was crying because he was "so upset with the pain." (Tr. 677).

On October 18, 2011, plaintiff participated in a sleep study at MGH's Division of Sleep Medicine. (Tr. 681-683). The interpretation by Jeffrey Ellenbogen, M.D. ("Dr. Ellenbogen") reported plaintiff had moderate obstructive sleep apnea. (Tr. 683). A continuous positive airway pressure ("CPAP") machine was prescribed due to noted improvement of sleep continuity with use of the CPAP machine. (Tr. 683).

The liver biopsy requested by liver specialist Dr. Peng was performed October 19, 2011 at MGH. (Tr. 684-685). The pathology report showed "[m]oderate steatosis with no features of steatohepatitis and no fibrosis." (Tr. 685).

On October 26, 2011, plaintiff saw Byron Garcia, M.D. ("Dr. Garcia") for a psychiatric diagnosis review. (Tr. 692-695). Dr. Garcia diagnosed plaintiff with a cyclothymic disorder and recommended outpatient treatment. (Tr. 694). He also assigned plaintiff a GAF score of 60. (Tr. 695). The report from Mortimer after seeing plaintiff the following day for individual psychotherapy noted plaintiff was experiencing some distress regarding his physical condition, but was overall stable. (Tr. 696).

Plaintiff reported in a November 14, 2011 PT visit that his pain had "been really bad over" the prior week. (Tr. 699).

During a follow up visit with Dr. Dickinson on November 16, 2011, plaintiff reported he still had "a lot of pain" in his left hip.  (Tr. 701).  Dr. Dickinson noted the "liver biopsy was fairly benign."  (Tr. 703).

A consultation letter from David Saul Binder, M.D. ("Dr. Binder") to Drs. Dickinson, McCarthy and Levin dated November 28, 2011, noted plaintiff had pain at worst a ten out of ten level and at best a five out of ten level.  (Tr. 705).  Dr. Binder reported on examination that plaintiff's "primary pain generator" was the left hip along with "mild lumbar radiculpathy with coexisting myofascial pain that [was] also contributing to his low back discomfort."  (Tr. 706).  Dr. Binder suggested to plaintiff that he continue with PT.  (Tr. 706).

The clinical impression from a PT session on December 6, 2011, noted plaintiff had made "slow gains" with physical therapy.  (Tr. 711).  The physical therapist, Allison DeChristoforo ("DeChristoforo"), noted various spine and orthopedic specialists who had seen plaintiff encouraged him to continue with PT.  (Tr. 711).  DeChristoforo reported on December 16, 2011, that plaintiff seemed "to have reached a plateau with PT."  (Tr. 713).

On January 4, 2010, plaintiff met with Dr. Peng for a hepatology consultation.  (Tr. 714-718).  Dr. Peng noted plaintiff had "always been asymptomatic from a liver

standpoint." (Tr. 714). Dr. Peng recommended control of serum
lipids and glucose and continued to recommend "weight loss via
healthy diet and exercise." (Tr. 718).

On January 19, 2012, plaintiff met with Jonathan F. Bean,
M.D. ("Dr. Bean") in connection with left hip and leg pain.
(Tr. 659-661). Findings on examination showed: significant
tightness of plaintiff's quadriceps, hip flexors and iliotibial
band; "very subtle mild elevated left pelvis"; "mild sensory
loss in the left L5 distribution"; "mild weakness with extensor
halluces" and left hip abductors; and "no apparent leg length
discrepancy." (Tr. 659). Dr. Bean opined plaintiff "would
benefit from a comprehensive approach to management of his pain
concerns." (Tr. 659).

Notes from plaintiff's visit with Dr. Levin on January 30,
2012, report plaintiff had "degeneration of lumbar or
lumbosacral intervertebral disc" and "lumbar radiculopathy."
(Tr. 739) (capitalization omitted). Dr. Levin opined the
majority of plaintiff's pain was "originating from left L5
radiculopathy." (Tr. 739). Dr. Levin recommended switching to
an "extended release opioid pain medication" and continued
physical therapy. (Tr. 739).

On March 12, 2012, Dr. Levin noted plaintiff's "chronic low
back pain" had recently "gotten significantly worse." (Tr.
741). Dr. Levin increased pain medication dosage and encouraged

plaintiff to consider surgical options.  (Tr. 741).  On April 30, 2012, Dr. Levin reviewed recent MRI results that showed a "left paracentral large disc protrusion" at the L4/L5 level displacing the left L5 nerve root.  (Tr. 742).  Dr. Levin advised plaintiff continue with current medications and opined plaintiff may "benefit from acupuncture and massage therapy." (Tr. 742).

On March 27, 2012, plaintiff met with Saechin Kim, M.D., Ph.D. ("Dr. Kim"), an orthopedic surgeon.  (Tr. 746-748).  Dr. Kim opined plaintiff "probably has both anterior and posterior labral tears."  (Tr. 748).  Dr. Kim further opined "arthroscopy would be an option" and plaintiff was too young for total hip replacement, which would be the "final solution."  (Tr. 748). Dr. Kim concluded plaintiff's pain symptoms were "much more likely due to the worsening L4[/]L5 disc herniation" which needed to be addressed.  (Tr. 748).

An MRI on March 31, 2012, of plaintiff's lower left leg showed "subtle interstitial edema of peroneus and posterior muscle compartment with most severe involvement of [the] flexor hallucis longus muscle."  (Tr. 784).  Katan Patel, M.D. ("Dr. Patel") opined results "may reflect changes secondary to acute denervation" and recommended "[c]linical correlation for symptomatic compartment syndrome.  (Tr. 784).

Dr. Kim reviewed the March 31, 2012 MRI results with
plaintiff on April 12, 2012, during a follow up visit.  (Tr.
785-787).  Dr. Kim noted plaintiff's "left lower leg pain [was]
probably coming from the back" and plaintiff's hip problems were
the likely cause of plaintiff's "groin and hip pain."  (Tr.
785).  Dr. Kim emphasized plaintiff had "two separate issues and
that both would need to be addressed."  (Tr. 785).  Dr. Kim
found the MRI findings of the lower left leg were consistent
with plaintiff's L4/L5 disc herniation.  (Tr. 787).  Dr. Kim
recommended that if plaintiff wanted to pursue surgery, to start
with treating the back and address plaintiff's hip issues
subsequent to back surgery.  (Tr. 787).

On April 13, 2012, plaintiff met with podiatrist Jeremy
Cook, D.P.M. ("Dr. Cook") for evaluation of "sore and tired
feet."  (Tr. 788-789).  Plaintiff reported the pain in his feet
was "worse with hard surfaces particularly when he [was]
barefoot."  (Tr. 788).  Dr. Cook advised plaintiff that he had
"fat pad atrophy causing some of his pain in the left second and
third toes."  (Tr. 789).  Dr. Cook proscribed medication and
recommended stretching exercises.  (Tr. 789).

A letter from Dr. Levin dated May 9, 2012, stated plaintiff
had been taking "strong pain medications" to deal with acute
back pain.  (Tr. 791).  Dr. Levin noted the pain medications had
caused the overall pain to subside minimally.  (Tr. 791).  Dr.

Levin opined that because of plaintiff's condition he was "not able [to] sit or stand for longer than 10 or 15 minutes without break" and "used a cane to assist with ambulation and balance." (Tr. 791). Dr. Levin also opined, taking into consideration plaintiff's "lower back and left leg pain, spondylitic changes at multiple levels in [the] lumbar spine as well as left leg symptoms," that "it would be very difficult and almost impossible for this patient to find gainful employment." (Tr. 791).

III. <u>Vocational Testimony</u>

As to plaintiff's work capabilities, the VE testified that plaintiff could perform some of his past relevant work as a telemarketer or telephone solicitor and gallery manager. (Tr. 66-67). According to the VE, plaintiff's age, education, experience and physical capabilities allowed him to work unskilled jobs[3] that are sedentary.[4] (Tr. 67). Examples of other potentially available jobs included reception clerk, charge account clerk and surveillance system monitor. (Tr. 67). The VE also testified that if plaintiff's physical limitations

---

[3] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a).
[4] "Sedentary work" is work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . walking and standing are required occasionally." 20 C.F.R. § 416.967(a).

were furthered by a "need to recline at will during the day
three times for anywhere from 15 to 30 minutes, either to
relieve pain or to elevate the feet when they swell," plaintiff
would not be employable.  (Tr. 68).  The VE further stated that
if plaintiff were to "miss work two times per month," he would
not be employable.  (Tr. 68).

IV.  ALJ's Decision

    At the May 22, 2012 hearing, the ALJ heard testimony from
plaintiff and the VE.  (Tr. 37).  After a review of the record,
the ALJ applied the requisite five step analysis and found that
plaintiff had the "residual functional capacity to perform
sedentary work."  (Tr. 21).

    At step one, the ALJ found that plaintiff "has not engaged
in substantial gainful activity since April 1, 2005, the alleged
onset date."  (Tr. 19).  The ALJ concluded that while the
plaintiff had "worked after the alleged disability onset date,"
the amount of money plaintiff earned was less than what was
required for substantial gainful activity.  (Tr. 19-20).

    At step two, the ALJ found that plaintiff's "cervical and
lumbar degenerative disc disease, sciatica, hip dysplasia,
degenerative joint disease, gout in the upper and lower
extremities, cirrhosis of the liver, obstructive sleep apnea,
and obesity" caused "more than minimal functional limitations in
[plaintiff's] ability to perform basic work activities and are,

therefore, severe impairments." (Tr. 20). The ALJ found that plaintiff's "psychiatric conditions of depression and dyslexia" caused less than minimal functional limitations on plaintiff's ability to perform basic work activities. (Tr. 20). In arriving at these findings, ALJ relied on plaintiff's ability to perform "independent daily activities and ability to care for . . . [his] elderly roommate." (Tr. 20). The ALJ also relied on plaintiff's mental health treatment notes, a consultative exam and state agency assessments which all supported the conclusion that plaintiff's mental health impairments were non-severe. (Tr. 20).

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1, Part 404, Subpart P of the Code of Federal Regulations. (Tr. 21). Specifically, in making this conclusion, the ALJ considered whether plaintiff met or equaled "listing 1.04 for spinal disorder, and 1.02A for a major dysfunction of a weight-bearing joint." (Tr. 21). The ALJ found that "no treating or examining physician has proffered findings that are equivalent in severity to the criteria of this or any other listed impairment." (Tr. 21). The ALJ also considered "opinions of the state agency medical consultants" who had "reached the same conclusion." (Tr. 21).

At step four, the ALJ found that plaintiff had the RFC "to perform sedentary work." (Tr. 21). The ALJ found the following limitations regarding plaintiff's ability to perform sedentary work: "he could lift and carry 10 pounds occasionally and less than 10 pounds frequently, could stand or walk at 2 hours out of an 8 hour workday, and could sit for about six hours out of an eight hour workday with normal breaks . . . could occasionally climb ramps or stairs, but never ropes, ladders, or scaffolds, and could occasionally balance, stoop, kneel, crouch or crawl." (Tr. 21). He further determined that plaintiff "is capable of performing past relevant work as a phone sales representative, magazine sales representative, and gallery manager." (Tr. 29).

After review and consideration of the evidence, the ALJ found plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 27). The ALJ found plaintiff's testimony regarding his pain "inconsistent" with the RFC assessment and therefore "not credible." (Tr. 27).

At step five, in the alternative, the ALJ found that other jobs existed in significant numbers in the national economy suitable for plaintiff. (Tr. 29). Accordingly, the ALJ did not find plaintiff disabled within the meaning of the Social Security Act. (Tr. 30).

## DISCUSSION

I.   Jurisdiction and Standard of Review

        This court has the power to affirm, modify or reverse the
ALJ's decision with or without remanding the case for a hearing.
42 U.S.C. § 405(g).   Findings of fact by the ALJ are conclusive
if supported by substantial evidence.   See Richardson v.
Perales, 402 U.S. 389, 390 (1971); Seavey v. Barnhard, 276 F.3d
1, 9 (1st Cir. 2001); Manso-Pizarro v. Secretary of Health and
Human Services, 76 F.3d 15, 16 (1st Cir. 1996).   Findings of fact
are not conclusive if the ALJ derived such facts by "ignoring
evidence, misapplying the law, or judging matters entrusted to
experts."   Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).
The ALJ has the principal responsibility to resolve issues of
credibility and draw permissible inferences from evidentiary
facts.   Rodriguez v. Secretary of Health and Human Services, 647
F.2d 218, 222 (1st Cir. 1981).

        This court must affirm the ALJ's conclusion if it is
supported by substantial evidence "even if the record arguably
could justify a different conclusion."   Rodriguez Pagan v.
Secretary of Health and Human Services, 819 F.2d 1, 3 (1st Cir.
1997).   Substantial evidence exists if, "reviewing the evidence
in the record as a whole," a reasonable mind "could accept it as
adequate to support [the Commissioner's] conclusion."
Rodriquez, 647 F.2d at 222; accord Musto v. Halter, 135
F.Supp.2d 220, 225 (D.Mass. 2001) (quoting Ortiz v. Secretary of

40

Health and Human Services, 955 F.2d 765, 769 (1st Cir. 1991)).

Conflicts in the evidence are for the ALJ to resolve, not for

doctors or the courts.   Rodriguez, 647 F.2d at 222.

## II.  Disability Determination

The Social Security Act defines a disability as the:

> [I]nability to engage in any substantial gainful activity
> by reason of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Impairments must be of such severity

that the claimant is not only unable to do his previous work,

but in consideration of his or her "'age, education, and work

experience, engage in any other kind of substantial work which

exists in the national economy.'"   Deblois v. Secretary of

Health and Human Services, 686 F.2d 76, 79 (1st Cir. 1982)

(quoting 42 U.S.C § 423(d)(2)(A)).

To determine whether a claimant is disabled within the

meaning of the statute, the SSA applies a five step evaluation

process and considers all of the evidence in the record.  20

C.F.R. §§ 404.1520, 416.920; see Goodermote v. Secretary of

Health and Human Services, 690 F.2d 5, 6 (1st Cir. 1982).  In the

first step, the claimant is not disabled if he or she is

currently employed.  See Goodermote, 690 F.2d at 6.  If the

claimant is not employed, the ALJ proceeds to the second step to

evaluate if the claimant has a severe impairment or combination

of impairments.  See id.  A severe impairment or combination of impairments must meet a durational requirement of "not less than 12 months" and must "significantly" limit the claimant's "physical ability to do basic work activities."  20 C.F.R. §§ 416.909, 416.927(a), 404.1527(a).  If the claimant is not found to have a severe impairment or combination of impairments, he or she is automatically considered not disabled.  See Goodermote, 690 F.2d at 6.

If the claimant has a severe impairment or combination of impairments, then the analysis proceeds to the third step where the ALJ determines if the claimant's severe impairment or combination of impairments meets or is medically equivalent to one of the listed impairments in Appendix 1, Subpart P, Part 404 of the Code of Federal Regulations.  20 C.F.R. §§ 404.1520, 416.920; see Goodermote, 690 F.2d at 6.  If the impairment or combination of impairments meets or medically equals a listed impairment then the claimant is disabled.  If not, the analysis proceeds to step four.  See Goodermote, 690 F.2d at 6-7.

At step four, the ALJ must determine if the claimant can perform any of his or her previous relevant work[5] by comparing the claimant's current RFC "with the mental and physical demands

---

[5]  Previous relevant work is any substantial gainful activity lasting "long enough for you to learn to do it" done in the past 15 years.  20 C.F.R. § 404.1560(b)(1); SSR 82-62, 1982 WL 31386 (Jan. 1, 1982).

of [the claimant's] prior work." Manso-Pizzaro, 76 F.3d at 17.
If the claimant can perform any of his or her past relevant
work, the claimant is not disabled. See Goodermote, 690 F.2d at
7. In the first four steps, the claimant has the burden to
provide evidence and to prove an inability to perform past work.
See Manso-Pizzaro, 76 F.3d at 17; Freeman v. Barnhart, 274 F.3d
606, 608 (1st Cir. 2001) ("applicant has the burden of production
and proof at the first four steps of the process").

If the claimant successfully satisfies his or her burden by
showing he or she can no longer perform his or her past work,
the burden shifts to the Commissioner to show the existence of a
significant number of jobs in the national economy that the
claimant could perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c),
416.920(g), 416.960(c); Bowen v. Yuckert, 483 U.S. 137, 146 n.5
(1987); Rosado v. Secretary of Health and Human Services, 807
F.2d 292, 294 (1st Cir. 1986); Goodermote, 690 F.2d at 7. In
making this determination at step five, the ALJ must consider
the claimant's RFC, age, education and work experience. 20
C.F.R. §§ 404.1520(g), 416.920(g). If jobs the claimant can
perform exist in significant numbers in the national economy,
the claimant is not disabled. 20 C.F.R. §§ 404.1520, 416.920,
404.1545, 416.945.

III. Plaintiff's Argument

In disputing the Commissioner's decision, plaintiff claims the ALJ failed to properly consider plaintiff's diagnosis of liver cirrhosis and obstructive sleep apnea. Plaintiff further argues that the ALJ, in determining plaintiff's RFC, focused on plaintiff's "orthopedic impairments" and ignored his liver cirrhosis and sleep apnea impairments despite initially acknowledging their significance as severe impairments therefore affecting plaintiff's ability to work. (Docket Entry # 17). Plaintiff contends the ALJ was "completely silent" as to the effects liver cirrhosis and sleep apnea had on plaintiff's ability to perform substantial gainful activity. (Docket Entry # 17). Plaintiff submits that his liver cirrhosis and sleep apnea should have been taken into account in determining the RFC. Plaintiff further asserts that the ALJ's failure to quantify the effects of liver cirrhosis and sleep apnea created an "impermissible void" in the ALJ's decision. (Docket Entry # 17).

Plaintiff seeks both SSDI and SSI benefits. "A disabled person may qualify both for SSDI under Title II of the Social Security Act and for SSI under Title XVI of the Act." Dion v. Secretary of Health and Human Services, 823 F.2d 669, 670 (1st Cir. 1987). An individual is entitled to SSDI benefits if, among other things, he is disabled prior to expiration of "insured status." See Baez v. Astrue, 550 F.Supp.2d 210, 214

(D.Mass. 2008) (citing 42 U.S.C. § 423(a)(1)(A), (E)).
Accordingly, the parties agree that a disability, if any, must
be established on or before March 31, 2010, in order for
plaintiff to receive SSDI benefits.  (Docket Entry # 17, p. 9)
(Docket Entry # 24, p. 17).  Unlike SSDI, however, SSI
eligibility is based on a disability and an individual's income,
resources and other relevant characteristics in which "insured
status" plays no role, even though both SSI and SSDI otherwise
define "disability" in the same way.  See id., at 215 (citing 42
U.S.C. §§ 1381(a), 1382(c)).

As noted, plaintiff initially submits that the ALJ ignored
and failed to properly consider his liver cirrhosis and sleep
apnea even though he deemed them "severe" impairments.
Plaintiff posits that these severe impairments therefore
affected his ability to work.

"An impairment is 'severe' when it 'significantly limits
the claimant's physical or mental ability to do basic work
activities.'"  Ramos v. Barnhart, 2003 WL 1411959, at *1 (1st
Cir. March 21, 2003) (quoting 20 C.F.R. § 404.1520(c) and
omitting internal brackets) (unpublished); accord 20 C.F.R. §§
404.1520(c), 416.920(c).  "Basic work activities," in turn,
consist of:

> (1) Physical functions such as walking, standing, sitting,
> lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking; (3)

Understanding, carrying out, and remembering simple
instructions; (4) Use of judgment; (5) Responding
appropriately to supervision, co-workers and usual work
situations; and (6) Dealing with changes in a routine work
setting.

20 C.F.R. § 404.1521(b) and 416.921(b).  The ALJ concluded that
the liver cirrhosis and sleep apnea, individually or in
combination, significantly limited plaintiff's ability to
perform basic work activities.

In arriving at an RFC, an ALJ "must *consider limitations
and restrictions* imposed by all of an individual's impairments,
even those that are not 'severe.'"  SSR 96-8P, 1996 WL 374184,
at *5 (July 2, 1996) (emphasis added).  The applicable
regulations likewise require the ALJ to "consider all of [the
claimant's] medically determinable impairments," including the
"medically determinable impairments that are not 'severe.'"  20
C.F.R. §§ 404.1545, 416.945; see 20 C.F.R. § 404.1520 ("we will
assess and make a finding about your [RFC] based on all the
relevant medical and other evidence in your case record, as
explained in § 404.1545").  An RFC determination is therefore
based on "all of the relevant medical and other evidence" in the
case record and the RFC reflects the most a claimant can do
despite his or her limitations.  20 C.F.R. §§ 404.1545(a)(3),
416.945(a)(3); see also SSR 96-8P, 1996 WL 374184, at *5 (July
2, 1996).

Here, the ALJ considered both the sleep apnea and the liver cirrhosis in arriving at the RFC.  The relevant section of the opinion outlining the RFC analysis addresses each impairment. In particular, the ALJ recited plaintiff's testimony that he "sleeps in a recliner due to sleep apnea" and that he "does not sleep through the night."  (Tr. 22).  The ALJ also noted plaintiff's testimony that plaintiff sleeps an average of four hours "per night" and "takes naps two times per day for several hours each time."  (Tr. 22).  In the very next sentence, the ALJ recognized plaintiff's allegation that he had difficulty "remembering details, and maintaining focus and concentration." (Tr. 22).  Accordingly, the ALJ considered whether the sleep apnea impacted plaintiff's ability to focus, concentrate and remember details.  The ALJ additionally referenced plaintiff's sleep study from October 2011 and noted that it "showed moderate obstructive sleep apnea with improvement on CPAP."  (Tr. 27).

As to the liver cirrhosis, the ALJ stated in the section of the decision addressing the RFC that plaintiff had a "recent onset of liver cirrhosis due to a fatty liver."  (Tr. 22).  As noted in one of the exhibits the ALJ cited for this finding, an ultrasound performed on March 22, 2011, because of abnormal liver function tests revealed a "[f]atty liver" which, taken together with the splenomegaly, "raise[d] the possibility of diffuse liver disease."  (Tr. 565, 568).  The ALJ also cited,

inter alia, to the exhibit wherein Dr. Peng, the liver specialist plaintiff saw in June 2011 at the recommendation of Dr. Dickenson, described plaintiff as "asymptomatic from a liver standpoint" and opined that if plaintiff had cirrhosis, he was "well-compensated" as evidenced by "good synthetic function." (Tr. 589, 592). The ALJ additionally cited to the exhibit in which Dr. Dickinson noted that plaintiff's "liver biopsy was fairly benign" and there was "no cirrhosis on biopsy."[6] (Tr. 703).

In addition, the ALJ expressly stated that he "considered all" of plaintiff's symptoms in determining the RFC and arrived at the RFC after a "careful consideration of the entire record." (Tr. 21). More specifically, the ALJ stated that his finding that plaintiff could "perform sedentary exertional work with occasional postural limitations" was "based on the medical record as a whole." (Tr. 28).

It is true that the ALJ devoted the vast majority of the RFC discussion to plaintiff's orthopedic impairments. It is also true that, "An ALJ 'is not at liberty to ignore medical evidence.'" Nguyen, 172 F.3d at 35. Here, however, the ALJ did not ignore the severe impairments at issue and, in compliance

---

[6] The medical record is not extensive with respect to plaintiff's liver cirrhosis. The fact that the ALJ cited to exhibits without page numbers, therefore, does not avoid the conclusion that he recognized and considered the above noted findings.

with the regulations and in the context of a medical record predominantly focused upon orthopedic conditions, the ALJ considered the liver cirrhosis and sleep apnea impairments when assessing the RFC.  See generally Montore v. Astrue, 2012 WL 3583346, at *3-4 (D.N.H. Aug. 20, 2012) (ALJ's reliance on psychologist's opinion regarding claimant's bipolar disorder in the discussion of RFC "establishes that the ALJ considered claimant's bipolar disorder").

In a related argument, plaintiff maintains that the ALJ did not set out the weight afforded to the liver cirrhosis and sleep apnea impairments and how each impairment factored into the RFC and plaintiff's ability to perform substantial gainful activity. (Docket Entry # 17) (citing Nguyen v. Callahan, 997 F.Supp. 179, 182 (D.Mass. 1998)).  To the contrary, the ALJ discussed the sleep apnea in the context of plaintiff's assertions of an inability to remember details, focus and concentrate.  He recognized both plaintiff's testimony about his symptoms of averaging "four hours of sleep per night" and taking "naps two times per day" as well as the sleep study that showed only "moderate obstructive sleep apnea," which improved when plaintiff was "on CPAP."  (Tr. 22, 27).  In accordance with 20 C.F.R. § 404.1529, he considered these symptoms juxtaposed against the medical evidence of plaintiff's ambien prescription for "sleep disturbance" and "CPAP for sleep apnea" and the sleep

study that showed a "moderate" sleep apnea that improved "on
CPAP." (Tr. 22, 27); see 20 C.F.R. § 404.1529 (in determining
disability, Commissioner "consider[s] all [of the claimant's]
symptoms, including pain, and the extent to which [the
claimant's] symptoms can reasonably be accepted as consistent
with the objective medical evidence and other evidence").
Thereafter, the ALJ stated that he did not find plaintiff's
statements about his symptoms credible to the extent they were
inconsistent with the RFC (Tr. 27), which did not include a
nonexertional functional limitation.[7]  Contrary to plaintiff's
argument and in light of the medical evidence the ALJ recited,
it is therefore evident that he afforded little weight to the
sleep apnea impairment and alleged symptoms in arriving at the
RFC.

     The ALJ also addressed and considered the liver cirrhosis
impairment.  After characterizing the impairment as severe at
step two, the ALJ addressed the impairment in arriving at the
RFC by noting that it had a "recent onset" and was "due to a
fatty liver." (Tr. 22).  In making these findings, the ALJ

---

[7]  A "[n]onexertional capacity considers all work-related
limitations and restrictions that do not depend on an
individual's physical strength; i.e., all physical limitations
and restrictions that are not reflected in the seven strength
demands, and mental limitations and restrictions." SSR 96-8p,
1996 WL 374184, at *6 (July 2, 1996).  The seven strength
demands are "[s]itting, standing, walking, lifting, carrying,
pushing, and pulling." Id.

cited to the exhibits containing the above described liver
findings by Dr. Peng and Dr. Davidson.  Their findings did not
identify functional limitations or restrictions attributable to
the "asymptomatic" liver impairment.  See SSR 96-8p, 1996 WL
374184, at *2 (statute "requires that an individual's inability
to work must result from the individual's physical or mental
impairment(s)" and, "in assessing RFC, the adjudicator must
consider only limitations and restrictions attributable to
medically determinable impairments").  Consequently, the ALJ did
not include any limitations in the RFC attributable to the liver
cirrhosis impairment and therefore implicitly gave the effects
of the impairment on plaintiff's RFC little weight.

The decision in Nguyen is also distinguishable because it
addressed a record with *conflicting* psychological assessments
and the ALJ's failure to even mention the contradictory
assessment which, as a result, made it "impossible to determine
whether [the ALJ] merely discredited that assessment or, in
fact, overlooked that piece of psychological evidence most
supportive of Mr. Nguyen's claim."  Id.  Here, in contrast, the
ALJ explicitly addressed the sleep apnea and liver cirrhosis
impairments in the context of a medical record that focused on
plaintiff's orthopedic conditions.  Overall, the ALJ's failure
to incorporate limitations in the RFC attributable to

plaintiff's liver cirrhosis and sleep apnea impairments is
supported by substantial evidence.

It is also worth repeating that plaintiff has the "burden
at Step 4 to show that he . . . is unable to do past work due to
the significant limitation." Seavey v. Barnhart, 276 F.3d at 5.
The "claimant bears the burden of proving the limitations that
factor into the Commissioner's residual functional capacity
finding." Bard v. Social Security Administration Commissioner,
736 F.Supp.2d 270, 276 (D.Me. 2010); accord Henry v. Colvin, 585
Fed.App'x 918 (8th Cir. 2014) ("Henry failed to meet her burden
of establishing more limitations than those found by the ALJ in
his RFC determination, which were consistent with the medical
evidence") (unpublished); Babchook v. Commissioner of Social
Security, 2015 WL 3681107, at *15 (E.D.Mich. June 12, 2015)
(plaintiff bears burden at step four, "including proving her
RFC," and, "[a]t step five, the Commissioner does not have [to]
add anything to the RFC, 20 C.F.R. § 404.1560(c), and
consequently the burden to prove limitations remains with the
Plaintiff at this stage"); Prescott v. Social Security
Administration Commissioner, 2010 WL 4259001, at *3 (D.Me. Oct.
21, 2010).  Although plaintiff argued that a lack of sleep
necessarily impacts an individual's ability to function at work
at the May 2015 hearing, his memorandum does not point to
evidence of work-related limitations or restrictions in the

record attributable to the sleep apnea impairment.  See SSR 96-8p, 1996 WL 374184, at *2.

Plaintiff's arguments also fail to distinguish between a finding of severity at step two and an analysis of a claimant's RFC.  "An ALJ's finding that an impairment is severe does not necessarily translate into functional restrictions in the RFC." Hines v. Astrue, 2012 WL 2752192, at *9 (D.N.H. July 9, 2012); accord Huertas v. Astrue, 844 F.Supp.2d 197, 204 (D.Mass. 2012) ("a finding of severity at step two does not require a further finding that the impairments had a negative impact on a claimant's residual functional capacity at step four"); see Griffeth v. Commissioner of Social Security, 2007 WL 444808, at *3 (6th Cir. Feb. 9, 2007) (unpublished); Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cr. 2006) (summarily rejecting claimant's argument that ALJ failed to include step two limitations of severe mental impairment in "the RFC analysis at step four," explaining each step in "disability determination entails a separate analysis and legal standard" pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4)); Sykes v. Apfel, 228 F.3d 259, 268 n.12 (3rd Cir. 2000) ("finding under step two of the regulations that a claimant has a 'severe' nonexertional limitation is not the same as a finding that the nonexertional limitation affects residual functional capacity").

As a final matter, plaintiff argues the ALJ erroneously failed to add limitations based on the liver cirrhosis and sleep apnea impairments in the hypothetical questions submitted to the VE. "In order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." Arocho v. Secretary of Health and Human Services, 670 F.2d 374, 375 (1st Cir. 1982). As discussed above, the ALJ's omission of limitations attributable to the liver cirrhosis and sleep apnea impairments in the RFC was supported by substantial evidence. Accordingly, he properly did not include any such limitations or restrictions in the hypothetical questions posed to the VE. See Sousa v. Astrue, 783 F.Supp.2d 226, 235 (D.Mass. 2011) ("hearing officer's omission of these limitations from his determination of Sousa's residual functional capacity was supported by substantial evidence" and he therefore "properly excluded them from the hypothetical presented to the vocational expert"); accord Patterson v. Colvin, 2015 WL 1376298, at *13 (D.Mass. March 26, 2015) ("hearing officer was not obligated to present impairments to the vocational expert that he has deemed not credible").

CONCLUSION

54

In accordance with the foregoing discussion, the motion to reverse the decision of the Commissioner (Docket Entry # 16) is **DENIED** and the Commissioner's motion to affirm the decision of the Commissioner (Docket Entry # 23) is **ALLOWED**.

                            /s/  Marianne B. Bowler
                           **MARIANNE B. BOWLER**
                           United States Magistrate Judge